IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


BRENDA ORR,                         :
          Plaintiff
                                    :

          vs.                       : CIVIL NO. 1:CV-04-0557

METROPOLITAN LIFE INSURANCE         :
COMPANY, INC. a/k/a METLIFE,
INC. a/k/a METLIFE DISABILITY       :
a/k/a METLIFE GROUP, INC.,
          Defendant                 :


*M E M O R A N D U M*


*I.      Introduction*

        We are considering cross-motions for summary judgment

filed by the Plaintiff, Brenda Orr ("Orr"), and the Defendant,

Metropolitan Life Insurance Company ("MetLife").  Orr, a former

employee of Electronic Data Services ("EDS"), filed this lawsuit

pursuant to section 502(a)(1)(B) of the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for

wrongful termination of long-term disability ("LTD") benefits.

After careful review of the motions, as well the record, we will

deny both motions for summary judgment and remand the case to

MetLife for further consideration consistent with this

memorandum.

II.      *Background*

        A.   *Procedural History*

        Orr filed a claim in state court alleging the following based on MetLife's termination of her long-term disability benefits: (1) breach of contract, (2) punitive damages, (3) violation of the Pennsylvania Unfair Insurance Practices Act, (4) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and (5) bad faith.  (doc. 1, pp. 7-15).  MetLife removed the case to this Court because Orr's claims were within the scope of ERISA section 502(a)(1). (doc. 1).

        Nearly a year later, the parties submitted a stipulation of dismissal so that Orr could exhaust her administrative remedies.  (doc. 23).  The stipulation, which we approved, allowed Orr to appeal MetLife's decision to terminate LTD benefits.  *Id*.  After conducting a review pursuant to the stipulation, MetLife again denied LTD benefits.  Orr then moved to reinstate her complaint.  (doc. 27).  We granted Orr's motion (doc. 30), and Orr filed an amended complaint.  (doc. 31).

        The amended complaint contained claims for wrongful termination of benefits pursuant to ERISA section 502(a)(1)(B)[1]

------

        [1]  Section 502(a)(1)(B) provides:
            A civil action may be brought--(1) by a participant or beneficiary-- . . .(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan; . . . .

and breach of fiduciary duty pursuant to section 502(a)(3).[2]
*Id*.  In the wrongful termination of benefits claim, Orr alleges
that "MetLife, operating under a conflict of interest,
terminated the payment of long term disability benefits under
the Plan arbitrarily and capriciously and/or without complying
with the procedures required by the Plan, by ERISA, and by the
stipulation entered into by the parties."  *Id*. ¶ 34.  Orr's
second count claimed that "MetLife breached its fiduciary duties
in that it failed to act for the exclusive benefit of Plaintiff
Orr, it failed to act in accordance with the governing plan
documents and instruments, and it failed to disclose to Mrs. Orr
material information necessary to the review of the termination
of her LTD benefits."  *Id*. ¶ 39.

       After answering Count I of the amended complaint,
MetLife moved to dismiss Count II, arguing that it violated the
terms of the stipulation and that a breach of fiduciary claim
may not proceed when a party has another potential ERISA remedy
available under section 502(a)(1)(B).  (doc. 38).  We granted
MetLife's motion to dismiss Count II, concluding that the breach
of fiduciary duty claim was beyond the terms of the stipulation

_____

[2]  Section 502(a)(3) provides:
       A civil action may be brought--(3) by a
       participant, beneficiary, or fiduciary (A) to
       enjoin any act or practice which violates any
       provision of this subchapter or the terms of the
       plan, or (B) to obtain other appropriate
       equitable relief (I) to redress such violations
       or (ii) to enforce any provisions of this
       subchapter or the terms of the plan; . . . .

and that Orr's claim for wrongful termination of benefits would, if successful, provide adequate relief.  (doc. 51).

   After attempting to settle this dispute, the parties filed cross-motions for summary judgment as well as statements of material fact in support of each motion.  (docs. 74-88).  The motions are now ripe for our consideration.

   B.   *Factual Background*

   1.   <u>EDS's Long-Term Disability Plan</u>

   MetLife issued a long-term disability insurance policy to EDS to fund its Welfare Benefit Trust Long Term Disability Plan ("the Plan").  MetLife Statement of Material Facts ("SMF") ¶ 1.  The Plan, which is governed by ERISA, vests MetLife, as a fiduciary for Plan beneficiaries, with the discretion to interpret the terms, conditions, and provisions of the Plan and determine eligibility for Plan benefits.  *Id*. ¶¶ 2, 4; Orr's Response to MetLife's Statement of Material Facts ("Orr Resp. SMF") ¶ 4.

   The Plan pays LTD benefits to an employee who is covered by the Plan and who is "disabled" pursuant to the Plan. Bates 000016; doc. 81, ex. A, p. 14.  LTD benefits may be terminated when the employee is no longer disabled as defined by the Plan, or on "the date [the employee] cease[s] or refuse[s] to participate in a Rehabilitation Program as described in Work Incentive."  *Id*. at 000016-17; pp. 14-15.

   The Plan defines "disability" as follows:

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

1.    during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings at your Own Occupation from any employer in your Local Economy; or

2.    after the 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.

MetLife SMF ¶ 5.  The Plan defines "Rehabilitation Program," in relevant part, as:

1.    a return to active employment by you on either a part-time or full-time basis in an attempt to enable you to resume gainful employment or service in an occupation for which you are reasonably qualified taking into account your training, education, experience and past earnings; . . . .

Id. ¶ 7.

The Plan's Work Incentive provision details the benefits for an employee who, while disabled, participates in a Rehabilitation Program.  Specifically, the Plan provides:

While you are Disabled, you are encouraged to work or participate in a Rehabilitation Program . . . while Monthly Benefits are being paid to you. . . .   When you work while Disabled, you will receive the sum of the following amounts: 1.  your Monthly Benefit (including your Rehabilitation Incentive when applicable); 2. the amount of your earnings for working while Disabled . . . .

Bates 000019; doc. 81, ex. A, p. 17.  Notably, under the Plan,
LTD benefits terminate when an employee does not participate in
a Rehabilitation Program.  According to the Plan, "Monthly
Benefit payments will cease on the date you refuse to
participate in a Rehabilitation Program in which we determine
you are able to participate."  Bates 000020; doc. 81, ex. A, p.
18.

> ### 2.   Orr's Injuries and Her Application for Benefits

EDS hired Orr on September 27, 1999, as a Recourse
Administrator.  MetLife SMF ¶ 9.  Orr's duties included computer
keyboarding, using the telephone, copying, and filing.  *Id.*
Orr's job responsibilities also included retrieving claims from
a storage shed and sending outgoing mail.  Orr Resp. SMF ¶ 9.
On June 10, 2000, while on vacation, Orr slipped and fell in a
hotel bathroom, sustaining numerous injuries, including:
herniated cervical discs, stenosis, spondylosis, and rheumatoid
arthritis.  MetLife SMF, Orr Resp. SMF ¶ 10.  On August 14,
2000, Orr underwent a post-cervical discectomy fusion surgical
procedure for her neck injuries.  Orr Resp. SMF ¶ 10, 11.  From
June 13, 2000, through December 11, 2000, Orr received short-
term disability benefits through the Plan.  MetLife SMF ¶ 11.
After receiving short-term disability benefits for the maximum
period, MetLife began paying LTD benefits on December 12, 2000.
*Id.*  MetLife approved LTD benefits based on Orr's cervical disc

disorder with myelopathy and the aggravation of her cervical spinal stenosis. MetLife SMF ¶ 12.

In February 2001, MetLife undertook a "Rehab Review" of Orr's file, noting her cervical disc myelopathy and her rheumatoid arthritis. Orr Opp. SMF ¶ 13. On June 20, 2001, Orr spoke with a MetLife representative about a Functional Capacity Evaluation ("FCE") she had scheduled in connection with her personal injury lawsuit arising from the fall. MetLife SMF ¶ 13. On August 8, 2001, MetLife received a copy of the FCE results as well as the cover letter from George O'Malley, Jr., the therapist performing the evaluation, to Orr's treating physician, Dr. Mark R. Grubb. *Id.* ¶ 15. In the FCE cover letter, O'Malley noted that Orr's workday tolerance was up to six hours per day at a sedentary level. *Id.* ¶ 16.

MetLife forwarded Orr's FCE and her job description to its nurse consultant to determine if Orr could perform her job at EDS. *Id.* ¶ 17. The nurse concluded that Orr could return to work for up to six hours per day but MetLife would need to discuss the availability of such a position with EDS. *Id.* ¶ 18. The nurse was not sure, however, if Orr would be willing to return to work. *Id.* ¶ 19.

On September 26, 2001, MetLife received a copy of an office note from Orr's visit to Dr. Grubb to discuss the results of the FCE. *Id.* ¶ 20. Grubb agreed with the FCE and ordered follow up visits with Doctors Wiecks and Weinberg, as well as an

additional radiograph of Orr's cervical spine.  *Id*. ¶ 20; Orr
Opp. SMF ¶ 20.

On October 3, 2001, MetLife contacted EDS to discuss
Orr's FCE.  MetLife SMF ¶ 21.  MetLife reviewed the
determination that Orr's working capabilities would be limited
to: (1) sitting three to four hours for thirty-five minute
durations, (2) standing two to three hours for fifteen minute
durations, (3) walking one to two hours, and (4) wearing a head
set and responding to customers directly.  *Id*.  EDS informed
MetLife that it could accommodate Orr's return to work pursuant
to the restrictions beginning October 8, 2001.  *Id*. ¶ 22.  When
MetLife contacted Orr, however, she told MetLife that she did
not believe she could work six hours per day and that she would
seek a second opinion regarding the FCE's conclusions.  *Id*. ¶
23.  Orr also mentioned that she did not intend to return to
work at EDS.  *Id*.

On November 2, 2001, MetLife sent Dr. Grubb a copy of
Orr's job description and a request for his assessment of Orr's
ability to return to work in light of the FCE.  *Id*. ¶ 24.  Grubb
responded that Orr, "[m]ay return [with] restrictions per FCE."
*Id*. ¶ 25.  MetLife then referred Orr's file to a rehabilitation
specialist for review and to work with Orr pursuant to the
Plan's mandatory Rehabilitation Program.  *Id*. ¶ 26.  After
numerous attempts to contact Orr, on December 3, 2001, Orr and
the rehabilitation specialist discussed the FCE, Grubb's

agreement with the FCE, and Orr's ability to return to work for up to six hours per day. *Id.* ¶¶ 26-30. Orr indicated that she was willing to return to EDS but was concerned about her ability to do so based on her injuries. Orr Opp. SMF ¶¶ 30-31. Orr underwent an ergonomic evaluation on January 17, 2002. MetLife SMF ¶ 32. On February 7, 2002, EDS informed MetLife that it could bring Orr back to work pursuant to the FCE's restrictions; however, EDS could only offer Orr four hours per day. *Id.*

The rehabilitation specialist attempted to contact Orr on February 7, 2002, to advise her that EDS could return her to work beginning February 11, 2002. The specialist, however, was unable to reach Orr and left her a voicemail which Orr never received. MetLife SMF ¶ 33; Orr Opp. SMF ¶ 32-36. The specialist and the MetLife case manager attempted to reach Orr the next day and again left a message instructing her to return to work on February 11, 2002. MetLife SMF ¶ 34. Orr returned the call on February 10, 2002, a Sunday evening, explaining that she could not return to work on February 11 because she had an appointment with a neck specialist. *Id.* ¶ 35. On the morning of February 11, the rehabilitation specialist attempted to contact Orr and again left a message instructing her to return to work that day. *Id.* ¶ 36. That day, Orr called the case manager and informed her of the doctor's appointment in New Jersey as well as other medical appointments that would delay her return until February 13, 2002. *Id.* ¶ 37. During that

conversation, the case manager told Orr that she was required to return to work that day or MetLife would terminate her benefits. *Id*. ¶ 37.  In response, Orr stated that she would not return to EDS that day, she did not know when she would return to work, and she intended to contact her attorney to find out whether she had to return at all.  *Id*. ¶ 38.  The case manager again informed Orr of the mandatory Rehabilitation Program and explained that she was required to return to work or MetLife would terminate her benefits.  *Id*. ¶ 39.  Orr responded that she had to attend her appointment and would call her case manager later in the week.  *Id*.

On February 12, 2002, MetLife sent a letter to Orr advising her that it would not pay benefits beyond February 9, 2002.  *Id*. ¶ 40.  The letter explained that by failing to return to work on February 11, 2002, Orr did not comply with the Rehabilitation Program.  *Id*.  The letter also informed Orr of her right to appeal the decision if she believed that MetLife erroneously terminated her benefits.  *Id*. ¶ 41.[3]

       3.   <u>MetLife's Review Pursuant to the Stipulation</u>

Orr filed this lawsuit against MetLife on February 11, 2004, without having appealed the decision to terminate

---

[3]    Orr claims that she never received the February 12, 2002, termination of benefits letter.  Orr Opp SMF ¶ 42.  As support, Orr cites Shelly Gardner's deposition testimony that she did not know how the letter was sent and she did not recall whether she had confirmation that Orr received it.  *See* doc. 75, ex. A, p. 57.  We can not accept Gardner's inability to recall whether Orr received the termination letter as support for the contention that Orr did not, in fact, receive such a letter.

benefits.  After the case was removed to this Court, the parties entered a stipulation dismissing the case so that Orr could exhaust her administrative remedies.  The stipulation, which we approved, allowed Orr "60 days to submit documents, records or other proofs in support of her claim for continuation of LTD benefits based on disability."  (doc. 24).  MetLife agreed to consider Orr's "claim for continuation of LTD benefits based on disability pursuant to the Plan and E.R.I.S.A."  *Id*.  MetLife also agreed not to raise the issue of the timeliness of Orr's appeal.  *Id*.  The stipulation allowed Orr to reinstate the lawsuit in the event MetLife denied Orr's appeal; however, Orr agreed that she would not raise as an issue the reasonableness of her notice to return to work in February, 2002.  *Id*.

Orr submitted a number of documents in support of her appeal pursuant to the stipulation.  Orr Opp. SMF ¶ 45-47; MetLife SMF ¶ 45.  These documents included: (1) a vocational report of April 18, 2005, from Donald E. Jennings, Ed.D.; (2) a report from Dr. Steven Klein; (3) notes and reports from Dr. Stanley J. Naides and Dr. George Wineburgh, both rheumatologists; (4) records from eye care providers; (5) records from Orr's surgeons; (6) medical records regarding Orr's psoriatic arthritis; and (7) medical records from Orr's knee surgery.  MetLife SMF, Orr Opp. SMF ¶ 45-47.  These documents, as well as the documents filed in support of Orr's initial application for LTD benefits, made up the record that was before

Shelly Gardner, MetLife's appeal specialist who handled the claim.  MetLife SMF ¶ 45.

Dr. Jennings, a vocational expert, evaluated Orr in April 2005.  MetLife SMF ¶ 48.  Jennings' report was based on his interview with Orr, vocational testing, and medical records including the report of Dr. Klein.  Orr Opp. SMF ¶ 50.  The report contained Orr's statements that: (1) she was not involved in ongoing care for neck problems and had not received physical therapy since August 10, 2001, (2) she was seeing her rheumatologist once every six months for the treatment of arthritis, (3) she was seeing her ophthalmologist once a year, and (4) she was seeing her family doctor as needed.  MetLife SMF ¶ 49.  While Jennings partially relied on the medical opinion of Dr. Klein and Dr. Grubb's notes of treatment through February 28, 2001, in reaching his conclusion, he did not refer to the June 28, 2001, FCE or the September 28, 2001, assessment of Dr. Grubb that Orr was capable of working up to six hours.  *See* MetLife SMF, Orr Opp. SMF ¶ 50, 51.  Jennings concluded that Orr is "unable to work on any sustained basis, either full or part time, and therefore, must be considered unemployable."  Orr SMF ¶ 45-47(b).  In reaching this conclusion, Jennings did not reconcile the April 2005 report from Dr. Klein which stated that Orr was able to sit for two to three hours at one hour intervals, she could stand and walk one to two hours with one hour intervals each, she could occasionally lift up to twenty

pounds, she could use both hands grasping, pushing and manipulating, drive for up to thirty minutes, and occasionally reach and carry but could not bend, squat, crawl, or climb. MetLife SMF ¶ 52.

An April 14, 2005, report from Dr. Steven Klein was also before Gardner. MetLife SMF ¶ 53. Klein examined Orr, reviewed her medical records, and diagnosed Orr with psoriasis, psoriatic arthritis, cervical radiculitis, cervical spinal stenosis, arthritic involvement of knees, cervical herniated nucleus pulposus, gastroesophageal reflux disease symptoms, lumbrosacral spine strain and sprain with myofascitis, status post anterior discectomy with fusion from C5/C6 to C6/C7, and bilateral knees internal derangement requiring knee replacements. Orr Opp. SMF ¶ 53-56. Dr. Klein's report concluded that Orr "ha[d] sustained a significant injury to her cervical spine that ha[d] rendered her 100% totally and permanently disabled for any type of employment. This would have been true as of February of 2002." Orr SMF ¶ 26(a). Dr. Klein, however, did not review any of the records from Dr. Grubb, Orr's treating orthopedic surgeon, or the June 28, 2001, FCE. MetLife SMF ¶ 56.

Finally, Orr provided Gardner with updated records from her ophthalmologist and rheumatologist and she resubmitted the medical records that were before MetLife when she was originally granted LTD benefits. MetLife SMF ¶ 57. These

13

records included: (1) progress notes and reports through February 2005, from Dr. Stanley Naides, (2) progress notes and reports through June 2003, from Dr. George Wineburgh, (3) records from an eye doctor, (4) orthopedic records regarding Orr's surgery, (5) medical records documenting Orr's psoriatic arthritis, and (6) hospital records regarding Orr's knee surgery.  Orr Opp. SMF ¶ 57-58.

Gardner, in connection with her review, sent Orr's file to three outside physicians.  MetLife SMF ¶ 60.  Dr. Robert Y. Pick, an orthopedic surgeon, Dr. Elinor Mody, a rheumatologist, and Dr. George Yanik, an ophthalmologist are consultants who work for Elite Physicians, Ltd., a vendor MetLife uses for medical review in insurance claims.  *Id.*; Orr Opp. SMF ¶ 60.  The consultants issued their reports based on a review of Orr's records, not a physical evaluation of Orr.  Orr Opp. SMF ¶ 61-62, 63-64; MetLife SMF ¶ 66.

Dr. Pick concluded that from an orthopedic perspective, there was nothing to substantiate Orr's inability to work in a sedentary-light work capacity from 2002 forward.  MetLife SMF ¶ 61-62.  Pick, however, did not physically examine Orr and only considered Orr's orthopedic limitations.  Orr Opp. SMF ¶ 60, 61-62.  Dr. Mody similarly considered Orr's file solely from a rheumatological perspective and concluded that there was insufficient evidence to support a decreased level of functionality from February 2002 forward.  MetLife SMF ¶ 63-64.

Dr. Yanik, the third outside physician consultant, concluded that from an ophthalmological perspective, there was nothing preventing Orr from working more than four hours per day from February 2002 forward. *Id*. ¶¶ 65, 66.

In reviewing the appeal, Gardner was verbally "instructed to review whether or not the denial of benefits was appropriate in light of what was considered to be an obligation to participate in a mandatory rehab." Orr SMF, MetLife Opp. SMF ¶ 28. Based on her review of Orr's documents, as well as the reports from the three doctors from Elite Physicians, Ltd., Gardner concluded that the original determination to terminate Orr's benefits was appropriate. MetLife SMF ¶ 67. In conducting her review, however, Gardner did not make any notes, and she only made one diary entry regarding her review. Orr SMF ¶¶ 36, 37. On July 18, 2005, Gardner informed Orr that the 2002 termination of LTD benefits was appropriate and that the claim would remain denied. MetLife SMF ¶ 67.

III.     *Legal Standard for Summary Judgment Motions*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, we may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In reviewing the evidence, we must construe facts and inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 553 (1986).  Summary judgment must be entered for the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Id.* at 586-87 (citations omitted).

        The moving party bears the initial responsibility of stating the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  It can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

        An issue is "genuine" "only if a reasonable jury, considering the evidence presented, could find for the nonmoving party."  *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  A fact is "material" when it would affect the outcome of the trial under the governing law.  *Anderson*, 477 U.S. at 248.

        When a moving party has carried the burden under Rule 56(e), the burden shifts to the nonmoving party to demonstrate that an issue of material fact exists.  The nonmoving party

"must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87 (citations omitted).  The nonmoving party "must present *affirmative evidence* in order to defeat a properly supported motion for summary judgment," and "cannot simply reassert factually unsupported allegations contained in [the] pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citation omitted).  "If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).  Factual averments in briefs do not satisfy the nonmoving party's burden. *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir. 1992).

IV.     *Discussion*

        A.   *The Parties' Stipulation*

        As discussed, the parties entered a stipulation in 2005 in which Orr voluntarily dismissed her complaint and agreed to file an appeal of the denial of her claim for LTD benefits. Orr's wrongful denial of benefits claim arises from MetLife's decision to deny benefits based on its review pursuant to the stipulation; however, the parties disagree as to the proper scope of MetLife's review.  The relevant clauses in the stipulation provide:

                1.  Plaintiff Brenda Orr agrees to file a
                claim  for  continuation  of  long  term

17

>disability benefits based on disability
>effective February 11, 2002.
>
>2.  Plaintiff Brenda Orr shall have 60 days
>to submit documents, records or other proofs
>in support of her claim for continuation of
>LTD benefits based on disability.
>
>3.  Defendant shall process and respond to
>such claim for continuation of LTD benefits
>based on disability pursuant to the Plan and
>E.R.I.S.A.  (doc. 24, ¶¶ 2, 3).

According to Orr, the use of "based on disability" limited MetLife's review to whether Orr was "disabled" as the term is defined in the Plan.  (doc. 90, p. 10).  MetLife, on the other hand, argues that the quoted language allowed it to first consider whether Orr was "disabled" and, if so, whether she participated in the Plan's Rehabilitation Program.[4]  (doc. 91, p. 3).

We interpret a stipulation entered into by the parties to a lawsuit according to the general principles of contract construction.  *USX Corp. v. Penn Cent. Corp.*, 130 F.3d 562, 566 (3d Cir. 1997) (quoting *Pittsburgh Terminal Corp. v. Baltimore & Ohio Railroad Corp.*, 824 F.2d 249, 254 (3d Cir. 1987)).  Our first inquiry is whether the stipulation is ambiguous as a matter of law.  *Id.* (citing *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir. 1995)).  As quoted in our Order requesting briefing on this issue:

>To decide whether a contract is ambiguous, we
>do not simply determine whether, from our

---

[4]  As discussed *supra*, participation in a Rehabilitation Program is a condition of the employee's continued receipt of LTD benefits.

> point of view, the language is clear.  Rather,
> we "hear the proffer of the parties and
> determine if there [are] objective indicia
> that, from the linguistic reference point of
> the parties, the terms of the contract are
> susceptible of different meanings."

*In re New Valley Corp.*, 89 F.3d 143, 150 (3d Cir. 1996)

(quoting *Sheet Metal Workers v. 2300 Group, Inc.*, 949 F.2d

1274, 1284 (3d Cir. 1991)).  In making a determination

regarding the existence of an ambiguity, we consider "the

contract language, the meanings suggested by counsel, and the

extrinsic evidence offered in support of each interpretation."

*Id*.  "Extrinsic evidence may include the structure of the

contract, the bargaining history, and the conduct of the

parties that reflects their understanding of the contract's

meaning."  *Id*.  If we determine that a contact provision is

ambiguous, we must consider extrinsic evidence to give clarity

to the meaning of the provision.  *Id*.

### 1.   Orr's Position

As noted, Orr contends that MetLife's task pursuant

to the stipulation was limited to determining whether she met

the Plan's definition of "disability."  (doc. 86, p. 4).

Therefore, "if Mrs. Orr were determined to be disabled she

would receive back benefits and reinstatement."  (doc. 90, p.

2).  Review pursuant to the stipulation would not, according to

Orr, consider whether Orr complied with the Plan's requirement

that Orr return to work through the Plan's Rehabilitation

Program.  *Id*. at 5.

Orr's supplemental brief points to the language and
structure of the stipulation, the communications between
counsel, and the parties' conduct in response to the
stipulation as support for her interpretation.  With respect to
the language of the stipulation, Orr claims that the
description of her application as a "claim for continuation of
LTD benefits *based on disability*" as well as MetLife's
obligation to "process and respond to such claim for
continuation of LTD benefits *based on disability* pursuant to
the Plan and E.R.I.S.A." limited the scope of MetLife's review
to whether Orr was disabled under the Plan.  *Id*. at 3 (emphasis
added).  Second, Orr claims that the stipulation refers to
Orr's claim as one for LTD benefits "based on disability" five
times without expressly mentioning the Rehabilitation Program.
*Id*.

Orr also argues that the communications between
counsel for Orr and MetLife support this interpretation.  Orr
refers to a January 11, 2005, letter from her counsel, Eric
Zajac, to MetLife's counsel, Veronica Saltz, discussing
dismissal of the complaint to permit an administrative appeal.
In the letter, Zajac noted that "it was questionable as to
whether [Orr] would have been able long term to continue
working."  *Id*. at 2.  Orr points to Saltz's response, which
provided, in relevant part: "If in fact it was determined that
your client is disabled based on satisfactory medical proof,

your client would likely be entitled to back benefits with her

benefits reinstated," as showing that the parties agreed that

the only issue was whether Orr met the Plan's definition of

disability.  *Id*.  Orr also refers to communications between

Zajac and Saltz regarding the type of medical records Orr was

required to provide for MetLife's review as showing that

whether Orr was "disabled" was the only issue to be considered

pursuant to the stipulation.  *See id*. at 3-4.

Finally, Orr refers to the July 18, 2005, letter

denying her appeal as showing the parties' understanding that

MetLife only considered whether she was "disabled" within the

meaning of the Plan.  Orr claims that the denial letter made no

reference to Orr's compliance with a Rehabilitation Program,

instead discussing MetLife's determination about Orr's medical

condition.  *Id*. at 5.

2.   MetLife's Position

MetLife not only reviewed whether Orr was "disabled"

as defined by the Plan, but also considered whether she

complied with the Plan's Rehabilitation Program.  *See* doc. 74,

p. 24.  Thus, under MetLife's review, Orr did not show that she

was completely unable to return to work.  If she had, she would

have received LTD benefits and would not have been subject to

the Rehabilitation Program.  Instead, MetLife concluded--as it

had in its 2002 benefits determination--that Orr was capable of

working at least four hours per day and that her failure to

participate in the Rehabilitation Program required termination of her LTD benefits. *Id*. at 24-25.

MetLife refers to the language of the stipulation, the parties' bargaining history, their conduct, and the circumstances surrounding the review to argue that the stipulation unambiguously contemplated review regarding whether Orr met all of the Plan's requirements. First, MetLife refers to the caption of the stipulation, which provided: "Stipulation of Dismissal Without Prejudice to Allow for Exhaustion of Administrative Remedies Under E.R.I.S.A." (doc. 24). According to MetLife, the caption demonstrates that the review was to give Orr an opportunity to appeal MetLife's 2002 decision to terminate her benefits, a decision which did so on the basis of Orr's ability to work on a part-time basis and her failure to comply with the Rehabilitation Program. (doc. 91, p. 1).[5]  Therefore, the stipulation called for an appeal of MetLife's prior decision to deny benefits, not for a new and narrower review of whether Orr met the definition of "disability." *Id*. at 1-2.

MetLife also refers to the bargaining history between counsel for the parties in support of its arguments. Quoting a January 11, 2005 letter, from Saltz to Zajac, MetLife

---

[5]  MetLife also cites to an email from Orr's counsel agreeing to stay the litigation pending the submission of an "Appeal and Review by the Appeals Division of MetLife" as showing that the review pursuant to the stipulation was not a new, more limited review of Orr's LTD benefits application.  (doc. 91, p. 5) (citing doc. 90, ex. 5).

questioned whether Orr's claim was that she was permanently
disabled and could not return to work, or that MetLife did not
provide reasonable notice to return to work.  *Id.* at 4-5.
MetLife, in support of its argument that Orr was claiming the
former, points to the stipulation's agreement that Orr would
not raise the reasonableness of its notice to return to work as
a basis for the wrongful denial of benefits claim.  *Id.* at 5.

Third, MetLife argues that its actions in considering
Orr's appeal are consistent with the stipulation calling for
review pursuant to the entirety of the Plan.  MetLife points to
the testimony of Shelly Gardner, who understood her role as
reviewing the 2002 termination decision which concluded that
Orr could work a maximum of six hours and that she failed to
comply with the Plan's Rehabilitation Program.  *Id.* at 6-7.
Therefore the appeal pursuant to the stipulation reviewed this
decision, not the narrower decision espoused by Orr.

### 3.   The Stipulation is Not Ambiguous as a Matter of Law

We first look to the terms of the stipulation because
"[t]he strongest external sign of agreement between contracting
parties is the words they use in their written contract."
*Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d
1001, 1009 (3d Cir. 1980).  We should give the words of the
stipulation their plain and ordinary meaning.  *Id.* at 1010.
The fact that Orr and MetLife disagree as to the meaning of the
stipulation does not make it ambiguous.  *Duquesne*, 66 F.3d at

614.   The language in the stipulation provided that Orr would
file "a claim for continuation of long term disability benefits
based on disability." (doc. 24, ¶ 1). "Base" means "To place
on or upon a foundation or logical basis." *Oxford English
Dictionary*, 2d Ed. 1989.   Accordingly, Orr's claim that she was
disabled would be the basis for her application to receive LTD
benefits.   The parties then describe MetLife's obligations:
"Defendant shall process and respond to such claim for
continuation of LTD benefits based on disability pursuant to
the Plan and E.R.I.S.A." (doc. 24, ¶ 3).   "Pursuant to" means:
"In compliance with; in accordance with; under." *Black's Law
Dictionary* (8th ed. 2004).   MetLife, therefore, was to consider
Orr's claim in accordance with the Plan's requirements for
awarding LTD benefits.   Reading these sections together reveals
that while Orr was claiming that she was disabled and,
therefore, eligible for LTD benefits, MetLife's task in
reviewing her claim was to do so according to the guidelines of
the Plan.   Contrary to Orr's claim, the phrase "based on
disability" did not limit the scope of MetLife's review;
rather, it provided the foundation for Orr's claim for LTD
benefits.

        Orr does not present objective indicia showing that
the language is susceptible to her interpretation.   As noted by
MetLife, the caption of the stipulation provides that the
parties agreed to dismiss the complaint "to allow for

exhaustion of administrative remedies." (doc. 24). To do so, Orr could appeal MetLife's 2002 decision which terminated her LTD benefits after finding that she did not participate in the Rehabilitation Program even though she could work up to six hours per day. Bates 000114-000115; doc. 81, ex. B, pt. 1, pp. 59-60. As the 2002 benefits decision considered Orr's medical condition as well as whether she complied with the Rehabilitation Program, the stipulation, which called for an appeal of the 2002 decision, supports MetLife's claim that review pursuant to the stipulation was not limited to disability.

Orr's reference to the parties' communications does not change our conclusion. For example, Orr quotes from a July 15, 2005, letter from Zajac to Saltz to show that "MetLife was to consider the claim that Ms. Orr was *fully* disabled pursuant to the Plan and ERISA." (doc. 90, p. 5). The letter, discussing MetLife's review pursuant to the stipulation, provides: "Please be advised that we submitted in Mid-April all of our materials in support of *our claim that Ms. Orr was fully disabled* as of the time she was set up to be fired." *Id*. While this communication shows that Orr claimed that she was fully disabled, it does not also signal that MetLife was precluded from considering the Rehabilitation Program requirement in its review.

We conclude that the language of the stipulation is
not ambiguous because it is not objectively susceptible to two
meanings.  Giving the language its plain meaning, MetLife's
task pursuant to the stipulation was to consider the appeal of
its original denial of benefits pursuant to the entirety of the
Plan.  Consequently, in considering Orr's wrongful denial of
benefits claim, we will apply the standard of review discussed
*infra* to MetLife's decision to deny benefits pursuant to the
Plan.

B.   *Standard of Review for Orr's Claim*

We next consider the proper standard of review to use
in evaluating Orr's wrongful termination of benefits claim.
Courts use a *de novo* standard "unless the benefit plan gives
the administrator or fiduciary discretionary authority to
determine eligibility for benefits or to construe the terms of
the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,
115 (1989).  When the administrator has this authority, courts
apply an arbitrary and capricious standard of review.  *Abnathya
v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993).
Under arbitrary and capricious review, we may overturn an
administrator's decision to deny benefits "if it is 'without
reason, unsupported by substantial evidence or erroneous as a
matter of law.'" *Id*. (quoting *Adamo v. Anchor Hocking Corp.*,
720 F. Supp. 491, 500 (W.D. Pa. 1989)).  *See also Smathers v.
Multi-Tool, Inc. / Multi-Plastics, Inc. Employee Health and*

26

*Welfare Plan*, 298 F.3d 191, 199-200 (3d Cir. 2002) (also finding a decision arbitrary and capricious if the administrator failed to comply with the plan's procedures).  In considering a claim, however, a court may not substitute its own judgment for that of the plan administrator.  *Stratton v. E.I. Dupont DeNemours & Co.*, 363 F.3d 250, 256 (3d Cir. 2004). That is, the court's review should be based on the record available to the plan administrator and should not represent the court's independent judgment of the claimant's disability. *See Kosiba v. Merck & Co.*, 384 F.3d 58, 69 (3d Cir. 2004).

The measure of deference given to the plan administrator's decision in our arbitrary and capricious review may be diminished depending on the structure of the benefits plan and other factors.  According to the Third Circuit, "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 378 (3d Cir. 2000).  This structural conflict of interest "mandates a 'heightened' arbitrary and capricious standard of review." *Lasser v. Reliance Std. Life Ins. Co.*, 344 F.3d 381, 385 (3d Cir. 2003).

Recognizing the need to tailor our standard of review to the presence of a conflict of interest, we employ a sliding-scale approach, intensifying our review to match the degree of

conflict. *Pinto*, 214 F.3d at 393. According to the sliding
scale, our review is more penetrating the greater the suspicion
of partiality, and less penetrating with a smaller suspicion of
partiality. *Id*. at 392-93. Such an approach enables us to
"review[] the merits of the interpretation to determine whether
it is consistent with an exercise of discretion by a fiduciary
acting free of the interests that conflict with those of the
beneficiaries." *Stratton*, 363 F.3d at 254 (quoting *Pinto*, 214
F.3d at 391). Pursuant to the sliding-scale approach, we "look
not only at the result--whether it is supported by reason--but
at the process by which the result was achieved." *Pinto*, 214
F.3d at 393. Factors cited in *Pinto* as relevant to our
analysis include: (1) the sophistication of the parties, (2)
the information accessible to the parties, (3) the financial
arrangement between the insurer and the company, and (4) the
current status of the fiduciary. *Id*. at 392.

    We may also heighten our scrutiny where there is
"demonstrated procedural irregularity, bias, or unfairness in
the review of the claimant's application for benefits."
*Kosiba,* 384 F.3d at 66. Evidence of procedural bias may be
visible in an administrator's self-serving use of one doctor's
expertise, an inconsistent treatment of the same facts, or,
when confronted with a decision, repeatedly choosing the option
disfavorable to the claimant. *Id*. (quoting *Pinto*, 214 F.3d at
393-94). In *Kosiba*, the Third Circuit found procedural

irregularity in the employer's intervention at the appeal stage of the employee's LTD benefits claim. *Id.* at 67. The employer requested an additional medical examination by a doctor of its own choosing when all of the other evidence supported a finding of disability. *Id.* According to the Third Circuit, "[t]his situation arguably has a quality to it that undermines the administrator's claim to the deference normally owed to plan fiduciaries" and therefore warranted a "moderately heightened" standard of review. *Id.* at 67-68.

The presence of both a structural conflict of interest and procedural irregularities calls for a "significantly heightened arbitrary and capricious standard of review." *Kaelin v. Tenet Employee Benefit Plan*, 405 F. Supp.2d 562, 580 (E.D. Pa. 2005) (citing *Kosiba*, 384 F.3d at 68). In such a situation, the court must "examine the facts before the administrator with a high degree of skepticism." *Id.* (quoting *Pinto*, 214 F.3d at 394). Nevertheless, even under the heightened standard, "'a plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan.'" *Smathers*, 298 F.3d at 199 (quoting *Orvosh v. Program Group Ins. for Salaried Employees of Volkswagen of Am., Inc.*, 222 F.3d 123, 129 (3d Cir. 2000)).

Here, the parties disagree regarding the appropriate standard of review.  According to Orr, we should use heightened arbitrary and capricious review because MetLife funds and administers the Plan and the circumstances of MetLife's review resemble the factors cited in *Pinto* as suggesting that a conflict may have influenced the administrator's decision. (doc. 76, p. 4-7).

Orr analogizes the irregularities cited in *Pinto* to MetLife's review of her own claim, arguing in favor of heightened arbitrary and capricious review.  According to Orr: Metlife terminated benefits based on her inability to return to work on short notice, MetLife terminated benefits even though Orr's condition had not improved, MetLife's termination letter relied on the 2001 FCE which states that she would be precluded from returning to full-time employment, and MetLife's letter upholding the termination of LTD benefits after review pursuant to the stipulation similarly provided no basis for doing so. *Id*. at 6.  Additionally, the 2005 denial letter relied on reports from three outside physicians who did not examine Orr and assessed her conditions according to their speciality, rather than in the aggregate.  *Id*. at 6-7.  The reports also did not address the conclusions of Orr's physicians.  *Id*. at 7.

Orr also claims that procedural irregularities show the presence of a conflict of interest.  First, she notes Gardner's testimony that despite the express language of the

stipulation, ERISA procedures did not apply to her review of
Orr's claim. *Id*. Orr also refers to Gardner's testimony that
she was only asked to review the claims decision that Orr did
not participate in the Plan's Rehabilitation Program as
violating the parties' stipulation. *Id*. Third, Orr points to
a number of regulations governing review of ERISA claims which
she alleges Gardner failed to follow. *Id*. at 7-9.

MetLife argues that we should use a "'true arbitrary-
and-capricious' standard of review," under which the decision
to deny Orr's benefits application "is not arbitrary and
capricious unless it is found to be clearly erroneous or
irrational as a matter of law." (doc. 74, p. 21-22). MetLife,
although conceding the presence of a structural conflict of
interest because it funds and administers the plan, nonetheless
claims that there is no basis for heightening our standard of
review. (doc. 85, p. 4). According to MetLife, a court's
deference in conducting arbitrary and capricious review "is
only discernibly reduced where there is evidence that the claim
administrator's capacity for fairness was **actually** adversely
affected by the conflict of interest." *Id*. MetLife also
claims that none of the other reasons cited by Orr requires a
heightened standard of review. *Id*. at 5.

We find that the structural conflict of interest and
procedural irregularities with respect to MetLife's review of
Orr's claim require significantly heightened arbitrary and

capricious review.  *See Kaelin*, 405 F. Supp.2d at 580; *Kosiba*, 384 F.3d at 68.  Accordingly, we will "examine the facts before the administrator with a high degree of skepticism."  *Id*. (quoting *Pinto*, 214 F.3d at 394).

The parties agree that the Plan gives MetLife discretionary authority to determine eligibility for benefits, moving our review from de novo to arbitrary and capricious.  In addition to its discretionary authority, the parties also agree that MetLife funds the Plan.  *See* doc. 74, p. 21.  This creates the structural conflict of interest discussed in *Pinto* and "warrants a heightened form of the arbitrary and capricious standard of review."  *Pinto*, 214 F.3d at 378.  How much to heighten our arbitrary and capricious review depends on the *Pinto* factors and any procedural irregularities in the handling of Orr's claim.

In *Pinto*, the Third Circuit noted four factors, sophistication of the parties, information accessible to the parties, relationship between the insurer and the company, and current status of the fiduciary, as bearing on heightening the standard of review.  *Id*. at 392.  Neither party, however, addresses these factors, so we proceed to our consideration of procedural irregularities.  We note that Orr refers to problems regarding MetLife's handling of the claim as "*Pinto* factors." We think these problems are more appropriately discussed as procedural irregularities which may affect the degree of

scrutiny in our arbitrary and capricious review.  In doing so,
we consider evidence of any "demonstrated procedural
irregularity, bias, or unfairness in the review of the
claimant's application for benefits."  *Kosiba*, 384 F.3d at 66.
When evaluating such evidence, we keep in mind that it should
suggest a type of self-dealing that would undermine MetLife's
claim to the deference normally owed to a plan administrator.
*See id*. at 67; *Pinto*, 214 F.3d at 393-94.  We will divide our
analysis into alleged ERISA violations and other procedural
anomalies.

### 1.   Alleged ERISA Violations

Orr first claims that MetLife violated applicable
ERISA procedures because Shelly Gardner believed that ERISA
procedures did not apply to the claim. (doc. 76, p. 7).  Orr
also points to Gardner's testimony that normally, as an appeals
specialist, she must make sure to follow ERISA guidelines.  *Id*.
MetLife responds by noting that Gardner's statement came in the
context of her explanation of why she did not seek additional
information from Orr's physicians when reviewing the file.
MetLife Opp. Orr SMF ¶ 32.  As noted by Orr, the stipulation
explicitly contemplated that Orr's appeal would be evaluated
pursuant to the Plan and ERISA.  (doc. 76, p. 7).  Gardner's
testimony that she was not aware of the parties' stipulation,
which expressly referred to ERISA coverage, reveals a
procedural defect which resulted in her belief that she was not

required to request additional information that may have been useful in weighing the impact of Dr. Klein's report.  *See* doc. 75, Ex. A, pp. 13-14.  We conclude that Gardner's deposition testimony shows a procedural irregularity which counsels heightening our standard of review.

Orr next cites a number of regulations governing ERISA claims review.  These regulations, which cover an application for benefits and require administrative processes and safeguards, equal treatment of claimants, and notice and an opportunity for the claimant to provide additional necessary information, were not applicable because, as discussed *supra*, Orr's claim was an appeal of the decision to terminate LTD benefits.  (doc. 76, pp. 7-8) (citing 29 C.F.R. §§ 2560.503-1, 2560.503.1(b)(5), 2560.503.1(f)(3)).

Orr also refers to regulations governing the appeal of a benefits determination.  Orr claims that MetLife did not establish a procedure providing her an opportunity to appeal an "adverse benefit determination" pursuant to 29 C.F.R. § 2560.503-1(h)(1).  We decline to heighten our standard of review on this basis because the parties negotiated a stipulation (doc. 24) which provided Orr with sixty days--in addition to the 180 days she originally had--to appeal the benefits denial.

Second, Orr contends that Gardner's review did not take into account all of the materials submitted by Orr in

support of her claim pursuant to 29 C.F.R. § 2560.503-1(h)(2)(iv).  Orr claims that Gardner failed to satisfy the regulation because her review did not contain any notes memorializing the review.  Orr SMF ¶ 36.  The regulation, however, requires that "*claims procedures*--(iv) Provide for a review that takes into account all comments, documents, records and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv) (emphasis added).  Both the Plan and the initial letter denying Orr's benefits provide procedures for appeal which take into account all of the materials submitted by the claimant.[6]

Third, Orr claims that MetLife failed to identify the medical experts whose advice it obtained in connection with the review pursuant to 29 C.F.R. § 2560.503-1(h)(3)(iv).  Presumably, Orr's argument refers to the July 18, 2005, denial

---

[6]  With respect to the procedures for appeal, MetLife's Plan provides: "When requesting a review, please state the reason you . . . believe the claim was improperly denied and submit any data . . . you . . . deem appropriate."  Bates 000052; doc. 81, ex. A, p. 50. The initial denial letter sent to Orr provided: "Please include in your appeal letter the reason(s) you believe the claim was improperly denied, and submit . . . any additional comments, documents, records, or other information relating to your claim that you deem appropriate for us to give your appeal proper consideration.  Synchrony will evaluate all the information and will advise you of our determination . . . ."  Bates 000115; doc. 81, ex. B, pt. 1, p. 60.

Nonetheless, Orr's frustration with Gardner's review is understandable.  As discussed *infra*, Gardner's review appears to have occurred without any written notes, leaving her deposition testimony as the only evidence of what was considered and what was given weight in reaching her decision.

letter which relied on outside physicians but did not disclose their names.  We do not read the regulation, however, to require explicit disclosure of such individuals in a denial letter.  According to the regulation: "[C]laims procedures" must "[p]rovide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination."  29 C.F.R. § 2560.503-1(h)(3)(iv). The regulations do not require that denial letters contain the identity of the outside physicians and there is no evidence that Orr was deprived of the identity of the physicians.  *See Kaelin*, 405 F. Supp.2d at 576-77.[7]

Fourth, according to Orr, MetLife did not establish reserves for Orr's claim as required for an insurer in the Commonwealth of Pennsylvania pursuant to 31 Pa. Code § 84a.4. As Orr's claim concerns MetLife's review and denial of her LTD benefits application pursuant to the federal ERISA statute, any argument regarding reserves required by the Commonwealth of Pennsylvania is not applicable here.

## 2.   Other Procedural Anomalies

Orr claims that other procedural anomalies require us to heighten our standard of review as well.  Orr compares her

---

[7]  We note that the February 12, 2002, denial letter provided, "Upon request, Synchrony will . . . identify any medical or vocational expert(s) whose advice was obtained in connection with your claim."  Bates 000115.

claim to the circumstances cited in *Pinto* which suggested bias
and self-dealing by the fiduciary and warranted a heightened
standard of review.  (doc. 76, pp. 5-7).

First, Orr claims that Gardner failed to review the
proper decision as agreed by the parties in the stipulation.
*Id*. at 7.  According to Orr, Gardner's review did not comply
with the stipulation because the review concerned Orr's
participation in the Rehabilitation Program instead of her
disability.  *Id*.  We decline to heighten the standard of review
on this basis.  As noted *supra*, Orr's appeal pursuant to the
stipulation was the prior decision denying her claim for LTD
benefits.  That decision considered her disability as well as
her failure to comply with the Plan's Rehabilitation Program.
While Orr's failure to participate in the Rehabilitation
Program was the rationale cited in the letter denying her
benefits, MetLife had considered her disability.  Additionally,
Gardner's testimony reveals that on appeal, she considered
whether Orr was able to work as of February 2002, not simply
whether she participated in the Rehabilitation Program.

Second, Orr claims that MetLife's termination of LTD
benefits "when [Orr] was unable to attempt to return to work on
short notice" warrants heightening our arbitrary and capricious
standard of review.  (doc. 76, p. 6).  We do not agree.  The
parties' stipulation explicitly provided that, in the event
that MetLife denied Orr's appeal pursuant to the stipulation,

37

Orr could submit an amended complaint "however, Plaintiff Brenda Orr agrees that she will not raise as a basis of wrongful denial of benefits that she was not provided reasonable notice to return to work in February, 2002." (doc. 24).

Orr's next set of arguments concerns the letter from Gardner to Orr denying her appeal pursuant to the stipulation. Bates 000710; doc. 81, ex. D, p. 75.  First, Orr contends that the letter "provides no basis for terminating benefits." (doc. 76, p. 6).  According to Orr, the denial letter merely recounts her continuing medical problems which were sufficient for MetLife to originally pay LTD benefits in 2000.  *Id*.  We disagree with Orr that the denial letter provides no basis for terminating benefits.  The letter reviewed Orr's doctor's notes, her 2001 FCE, as well as the reports of the three outside physicians and concluded that the original claims determination was correct.

Second, Orr claims that the 2005 denial letter relied on the 2001 FCE which limited Orr's work capacity to up to six hours at a sedentary level.  *Id*.  MetLife's reliance on the 2001 FCE; however, would not appear to raise any inference of bias or self-dealing, particularly because MetLife's denial, both of the original claim and the appeal, recognized that Orr could return to work in a limited capacity and simply failed to do so.

Orr's final argument regarding procedural irregularities affecting our standard of review concerns MetLife's use of outside physicians in connection with the review pursuant to the stipulation.  Orr makes three points with respect to the reports.  First, MetLife relied on reports of three outside physicians even though they did not examine Orr and only assessed her conditions according to their speciality.  (doc. 76, p. 6).  Second, the reports did not address the limitations recommended by the 2001 FCE.  *Id*. at 6-7.  Third, the reports did not consider the conclusions of the physicians supporting Orr's disability, Dr. Klein and Dr. Jennings.  *Id*.

We do not believe that MetLife's use of outside physicians to review Orr's file warrants heightening our standard of review.  As explained by the Third Circuit, "Independent medical examinations are not uncommon in the claims administration world, and this is responsible plan administration that we would not wish to deter. . . .  And we trust that courts will not penalize plan administrators for seeking independent medical examinations at appropriate stages of the claims determination process."  *Kosiba*, 384 F.3d at 68. In considering Orr's appeal for LTD benefits, Gardner requested medical examinations from Dr. Mody, a rheumatologist, Dr. Yanik, an ophthalmologist, and Dr. Pick, an orthopedic surgeon. Gardner did so because "[t]hose were the specialists that were

treating Mrs. Orr and we felt would have the most medical expertise to assist us in our review." (doc. 75, ex. A, p. 8). We recognize that the plan administrator's use of an independent medical examination in *Kosiba* provided a basis for heightening the standard of review; however, we believe the circumstances here are distinguishable. In *Kosiba*, the inference of bias by the fiduciary arose, in part, from its request for an independent medical examination despite every piece of evidence supporting the claimant's disability. *Kosiba*, 384 F.3d at 67. Here, Gardner considered the 2001 FCE, which concluded that Orr's workday tolerance was up to six hours per day at a sedentary level. Bates 000235; doc. 81, ex. B, pt. 2, p. 81. Gardner also had before her the conclusion of Dr. Grubb, Orr's treating physician, which agreed with the 2001 FCE. Bates 000655; doc. 81, ex. D, p. 20. Without the record entirely supporting Orr's total disability, we conclude that Gardner's request for reviews from outside physicians does not raise the inference of self-dealing as it did in *Kosiba*. With respect to Orr's claims regarding the shortcomings in the physician's evaluations and the content of the reports, such arguments are more properly addressed in our evaluation of the underlying merit of Orr's LTD benefits claim.

### 3.   Applicable Standard of Review

The presence of the structural conflict of interest as well as the procedural anomaly of MetLife's claims

administrator not believing that ERISA procedures applied despite the express language of the stipulation requires a significantly heightened standard of review.  *See Kosiba*, 384 F.3d at 68.  Accordingly, we review the facts before Gardner in determining Orr's LTD benefits claim "with a high degree of skepticism."  *Kaelin*, 405 F. Supp.2d at 580 (quoting *Pinto*, 214 F.3d at 394).

    C.    *Application of the Standard of Review to MetLife's Decision*

        The issue before the Court is whether MetLife acted arbitrarily and capriciously under the significantly heightened standard in determining that Orr did not meet the Plan's requirements to receive LTD benefits.  As discussed, in terminating Orr's LTD benefits, MetLife determined that Orr could work up to six hours, yet she failed to return to work as part of the Plan's Rehabilitation Program.  The parties' stipulation required Gardner to review the decision to terminate benefits.  Despite Orr's claim that her disability prevented her from returning to work in any capacity, Gardner affirmed the original claims determination that Orr could work up to six hours per day and had failed to comply with the Rehabilitation Program.

        After considering the decision-making process in Gardner's review of Orr's application pursuant to the stipulation, we conclude that MetLife acted arbitrarily and capriciously in denying Orr's benefits claim.  Our concern is

with MetLife's treatment of the reports of Dr. Steven Klein and

Dr. Donald Jennings, physicians who submitted reports

supporting Orr's disability.  Dr. Klein reevaluated Orr on

April 15, 2005, in connection with the litigation.  After

examining Orr and considering records from Doctors George and

Naides, Klein diagnosed Orr with the following medical

conditions: psoriasis, psoriatic arthritis, cervical

radiculitis, cervical spinal stenosis, arthritic involvement of

the knees, cervical herniated nucleus pulposus,

gastroesophageal reflux disease symptoms, lumbosacral spine

strain and sprain with myofascitis, status post anterior

discectomy with fusion from C5/C6 to C6/C7, and bilateral knee

internal derangement requirement knee replacements.  Bates

000440; doc. 81, ex. C, pt. 1, p. 48.  Klein concluded that

Orr's June 2000 fall caused "significant injury to her cervical

spine . . . that has rendered her 100% totally and permanently

disabled for any type of employment.  This would have been true

as of February of 2002."  *Id.*

        Gardner reviewed and took Klein's report into

consideration as she claimed to have done with all of the

information submitted in support of Orr's claim.  (doc. 75, ex.

A, p. 12).  Gardner's letter to Orr upholding the denial of

benefits neither mentions nor provides a basis for discrediting

Klein's report.  *See* Bates 000710-712; doc. 81, ex. D, p. 75-

77.  Additionally, Gardner kept no notes from her review of

Orr's claim which might have revealed her basis for not
crediting the report.  (doc. 75, ex. A, p. 13).  Therefore, we
look to Gardner's deposition testimony as it is the only record
of MetLife's consideration of Orr's appeal.  Gardner testified
that she discounted Klein's opinion that Orr was totally
disabled as of February 2002 because she was concerned about
the number of medical records Klein reviewed in reaching his
decision.  *Id*.  Gardner, however, admitted that Klein's report
was a reevaluation of Orr and she did not request the records
associated with Klein's prior evaluation of Orr.  *Id*. at 14.
When asked why she did not request these records, Gardner
replied: "Considering this wasn't a formal appeal, then some of
the rules regarding a formal appeal aren't adhered to or
don't--aren't in consideration such as requesting additional
information.  If it's not ERISA governed and we're not doing
appeal rights, then we don't request additional information."
*Id*.

        A plan administrator may not arbitrarily refuse to
credit a claimant's reliable evidence.  In *Black & Decker*
*Disability Plan v. Nord*, 538 U.S. 822 (2003), the Supreme Court
addressed the obligations of an ERISA claims administrator
considering different medical evidence.  While the Court
expressly declined to extend the "treating physician" rule to
ERISA cases--which would have required an administrator to
automatically give special weight to the opinions of a

claimant's treating physician--the Court did make clear that a
plan administrator may not simply disregard a claimant's
medical evidence.  The Court explained: "Plan administrators,
of course, may not arbitrarily refuse to credit a claimant's
reliable evidence, including the opinions of a treating
physician." *Nord*, 538 U.S. at 834.  Gardner's deposition
testimony--which is the only record available regarding the
review of Orr's claim--shows an arbitrary refusal to credit
Klein's report.  Gardner was either confused or simply believed
that Orr's claim was not within ERISA or MetLife's appellate
procedures and, on that basis, declined to credit Klein's
report.  While Gardner was not required to give any weight to
Klein's opinion, Gardner could not arbitrarily decide to
disregard it.

Gardner's treatment of Dr. Jennings' report shows a
similar disregard for medical evidence.  Jennings conducted
vocational testing and reviewed Orr's medical records, which
included medical records through October 2001 as well as
Klein's 2005 report.  Based on Jennings' testing and review of
the records, Orr had been disabled as of February 2002 and is
"unable to work on any sustained basis, either full or part
time . . . ."  Bates 000404; doc. 81, ex. C, pt. 1, p. 12.
Gardner, in providing her rationale for discounting Jennings'
report, explained that her "main objective was to review the
information that occurred in February of 2002, so if Dr.

Jennings is reviewing information for her current vocational status, that wouldn't give me a lot of information to understand what was going on with her in February 2002." (doc. 75, ex. A, p. 15). When informed that Jennings' opinion spoke to Orr's disability as of February 2002, Gardner then explained that she "still ha[d] a report that's from 2005 that is two or three years after the fact that the claim was denied when we had more current reviews, voc reviews, FCEs that were completed in 2001, 2002 that were closer to the date of the termination." *Id*. The three reports Gardner did credit in denying Orr's claim, however, were also from 2005. The reports of Doctors Pick, Mody, and Yanik, the outside physicians, were issued in 2005, and provided opinions as to her lack of disability in 2002. These reports formed a significant portion of Gardner's July 18, 2005, denial letter. *See* Bates 000710-12; doc. 81, ex. D, p. 75-77. Gardner's reliance on medical reports favorable to MetLife's position containing the same flaw cited as the basis for discounting Jennings' report shows an arbitrary refusal to credit evidence in support of Orr's claim.

Despite our finding that MetLife acted arbitrarily and capriciously in denying Orr's claim, we cannot determine Orr's disability status as a matter of law. Under these circumstances, we can either remand the case to MetLife for a renewed evaluation of Orr's claim, or we can award benefits. *Sanderson v. Cont'l Cas. Corp.*, No. 01-606, 2005 WL 2340741, at

45

*6 (D. Del. Sept. 26, 2005) (citing *Cook v. Liberty Life Assurance Co.*, 320 F.3d 11, 24 (1st Cir. 2003)).  As we are unable to make a disability determination, we will remand the case to MetLife for further proceedings consistent with this opinion.  It is possible that upon sufficient and explicit consideration and weighing of Orr's evidence, including her physician's reports, MetLife would again conclude that, as of February 11, 2002, Orr could have worked and that she failed to return to work pursuant to the rehabilitation program.  Indeed, the 2001 FCE and the conclusion of Orr's treating physician appear to support such a determination.  In remanding the case to MetLife, we refer the parties to *Sanderson v. Cont'l Cas. Corp.*, 279 F. Supp.2d 466 (D. Del. 2003) and No. 01-606, 2005 WL 2340741 (D. Del. Sept. 26, 2005), in the expectation that MetLife's review of Orr's claim will be meaningful and thorough.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: September 13, 2007

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


BRENDA ORR,                    :
         Plaintiff
                               :

     vs.                       : CIVIL NO. 1:CV-04-0557

METROPOLITAN LIFE INSURANCE    :
COMPANY, INC. a/k/a METLIFE,
INC. a/k/a METLIFE DISABILITY  :
a/k/a METLIFE GROUP, INC.,
         Defendant             :
```

*O R D E R*

AND NOW, this 13th day of September, 2007, upon

consideration of Plaintiff's Motion for Summary Judgment (doc.

78), Defendant's Motion for Summary Judgment (doc. 80), and

pursuant to the accompanying Memorandum, it is ordered that:

> 1.  Plaintiff's Motion for Summary Judgment
> is denied;
>
> 2.  Defendant's Motion for Summary Judgment
> is denied;
>
> 3.  This matter is remanded to MetLife, the
> claims administrator, to take further action
> consistent with this opinion;
>
> 4.  Within forty-five (45) days, MetLife shall
> advise the Court of its decision as to whether
> benefits were awarded or were not awarded, or
> whether another resolution was achieved;
>
> 5.  We retain jurisdiction over this matter for
> further proceedings, should they be necessary.

                               /s/William W. Caldwell
                               William W. Caldwell
                               United States District Judge